KUNSTSAMMLUNGEN ZU WEIMAR and Elisabeth Mathilde Isidore Erbgross-Herzogin Von Sachsen-Weimar-Eisenach (Grand Duchess of Saxony-Weimar), Plaintiffs-Intervenors,

and

Federal Republic of Germany, Original Plaintiff,

v.

Edward I. ELICOFON, Defendant.

No. 69 C 93.

United States District Court, E. D. New York.

June 15, 1981.

Botein, Hays, Sklar & Herzberg, New York City, for plaintiff-intervenor Kunstsammlungen zu Weimar; Harry I. Rand, Lawrence M. Kaye, Amy Adelson, David S. Weiss, and James Altman, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant; Richard W. Hulbert, George J. Grumbach, David G. Sabel, and Richard S. Lincer, New York City, of counsel.

*Memorandum of Decision and Order*

MISHLER, District Judge.

This action was commenced in 1969 by the Federal Republic of Germany, as the representative of the people of Germany, to recover possession from defendant Elicofon of two portraits painted by the renowned fifteenth century German artist Albrecht Duerer. The paintings disappeared from their place of safekeeping in Germany during the occupation of Germany by the Allied Forces in the summer of 1945. In 1966 the paintings were discovered in the possession of Elicofon, who had purchased them in Brooklyn, New York from an American serviceman in 1946.

By order dated March 25, 1969, this court granted the Grand Duchess of Saxony-Weimar leave to intervene as plaintiff. The Grand Duchess asserted ownership to the paintings by assignment from her husband, Grand Duke Carl August. And by order dated February 24, 1975, six years later, the Kunstsammlungen zu Weimar, a museum located in what is now the German Democratic Republic, the predecessor of which had possession of the paintings before their disappearance, and which claims to be entitled to recover them from Elicofon, was granted the right to intervene as plaintiff in this action.

Thereafter, on December 9, 1975, the original plaintiff, the Federal Republic of Germany, discontinued its claim with prejudice. And in a Memorandum of Decision and Order, dated August 24, 1978, 536 F.Supp. 813, this court dismissed the intervenor-complaint and cross-complaint of the Grand Duchess of Saxony-Weimar. Thus, the only parties remaining in the action are the plaintiff-intervenor Kunstsammlungen and the defendant Elicofon.

Presently before the court are the motions of plaintiff-intervenor Kunstsammlungen zu Weimar for summary judgment and the cross-motion of defendant Elicofon for summary judgment (Defendant's Memorandum of Law, p.2). Fed.R.Civ.P. 56.

## HISTORICAL SETTING & FACTS

Until 1927, the Duerer portraits which are the subject of this suit formed part of the private art collection of the Grand Duke of Saxe-Weimar-Eisenach. Under the terms of a Settlement Agreement of 1927 between the Land of Thuringia and the widow of Wilhelm Ernst, the then owner of the private collection, title to the Grand Ducal Art Collection had been transferred to the Land of Thuringia. Thuringia was created by Federal German Law of April 20, 1920 and was the legal successor to the territory of Weimar, which included as one of its seven subdivisions Saxe-Weimar-Eisenach, the territory over which the Grand Dukes formerly had presided before being ousted from power.[1]

In 1933, Hitler assumed power in Germany. Throughout much of the period of the Third Reich, until 1943, the Duerer paintings remained on exhibit in a museum in Weimar, Thuringia, known as the Staatliche Kunstsammlungen zu Weimar, the predecessor to the Kunstsammlungen zu Weimar. But in 1943, after the commencement of World War II, Dr. Walter Scheidig, the then Director of the Staatliche, according to his account, anticipated the bombardment of Weimar and had the Duerers and other valuable items of the museum transferred to a storeroom in a wing of a nearby castle, the Schloss Schwarzburg, located in the District of Rudolstadt in the Land of Thuringia, where they remained until their disappearance in the summer of 1945.

On May 8, 1945, the Hitler Government surrendered. On June 5, 1945, the Allied Powers—the United Kingdom, the United States, the U.S.S.R. and the French Republic—issued a Declaration stating that the Allied Governments assumed supreme authority with respect to Germany, including all the powers possessed by the German Government. For the purposes of occupation, Germany was divided into four zones with one of the Four Powers assuming military authority over each zone to effect its own policy in regard to local matters and the policy of the Allied Control Council in regard to matters affecting Germany as a whole.

Under the June 1945 Declaration the Land of Thuringia was designated to be part of the Soviet Zone of Occupation. However, the American Military Forces had occupied Thuringia, with a regiment stationed at Schwarzburg Castle, since the defeat of Germany or some time before the official surrender in April or May of 1945. In accordance with the Allied plan, on July 1, 1945, the United States turned over control of Thuringia to the Soviet Armed Forces. According to Dr. Scheidig's account, the disappearance of the Duerer portraits from Schwarzburg Castle coincided in time with the departure of the American troops from the Castle.

Political differences and disagreement over the future of Germany developed between the Western Allies and the Soviet Union. Irreconcilable divisions prompted the Soviet Union's Commander in Chief to resign from the Allied Control Council on March 7, 1948 and the Council thereafter

---

1. It was on the basis of the Settlement Agreement of 1927 that this court dismissed the intervenor complaint of the Grand Duchess of Saxony-Weimar, who had asserted ownership of the paintings by assignment from her former husband, Grand Duke Carl August. In our Memorandum of Decision dated August 24, 1978 we found that the terms of the Agreement absolutely foreclosed any claim of ownership by the Grand Dukes after 1927.

ceased meeting as the combined governing body of occupied Germany. On September 21, 1949, the Federal Republic of Germany was established in the former French, British and United States Zones; and on October 7, 1949, the German Democratic Republic was established in the former Soviet Zone.

On April 14, 1969, retroactive to January 1, 1969, the Minister of Culture of the German Democratic Republic, issued an order conferring juridical personality upon the former Staatliche Kunstsammlungen, which thereafter became known as the Kunstsammlungen zu Weimar, a status which under East German Law entitled the Kunstsammlungen to maintain suit for return of the Duerers. The Kunstsammlungen moved to intervene as a plaintiff in this action for return of the Duerer portraits in April 1969. In a Memorandum of Decision and Order dated September 25, 1972, we denied the motion to intervene on the ground that the Kunstsammlungen was an arm and instrumentality of the German Democratic Republic, a country not recognized by the United States at the time. 358 F.Supp. 747 (E.D.N.Y.1972), aff'd 478 F.2d 231 (2d Cir. 1973), cert. denied, 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489, reh. denied, 416 U.S. 952, 94 S.Ct. 1962, 40 L.Ed.2d 302 (1974). On September 4, 1974, the United States extended formal recognition to the German Democratic Republic. Accordingly, by order of February 24, 1975, upon motion, we vacated our prior order and permitted the Kunstsammlungen to file its complaint. In its complaint, the Kunstsammlungen alleges that the Duerer paintings were stolen in 1945 from the Staatliche Kunstsammlungen zu Weimar and that Elicofon acquired them from the thief or his transferee and, therefore, has no right to them; and that as successor to the rights of the former Territory of Weimar and Land of Thuringia, the Kunstsammlungen is entitled to immediate possession. In his answer Elicofon denies that he holds the paintings wrongfully and on the basis of certain affirmative defenses, which are asserted in support of his motion for summary judgment, denies that the Kunstsammlungen is entitled to recover the paintings.

## SUMMARY OF ARGUMENTS

A. In support of its motion for summary judgment, Kunstsammlungen argues:

There exists no genuine issue of material fact as to whether Elicofon could have acquired good title. The uncontradicted account of Dr. Scheidig, Director of the Kunstsammlungen at the time the paintings disappeared, creates the irrefutable inference that the paintings were stolen in 1945 from Schwarzburg Castle. Thus, Elicofon could not have acquired good title to the Duerers even if he purchased them without knowledge of their source.

B. In support of its motion for summary judgment dismissing the complaint Elicofon argues:

1. Assuming that Elicofon did not acquire good title upon his purchase of the paintings, he later acquired title under the German law doctrine of ERSITZUNG.

2. (a) The Kunstsammlungen's claim is barred by the statute of limitations.
 (b) Even if the Kunstsammlungen's claim is not barred by the statute of limitations, the Kunstsammlungen is estopped because of inordinate delay in prosecuting its claim.

3. (a) The Kunstsammlungen lacks standing.
 (b) Under German law the Kunstsammlungen lacks the capacity to prosecute the claim.

Each of the grounds advanced by the parties is discussed separately below.

### A. The Kunstsammlungen's Motion for Summary Judgment

In moving for summary judgment the movant bears the burden of showing the absence of a genuine issue as to any material fact. Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Kunstsammlungen argues that the irrefutable facts in this case indicate that Elicofon could not have acquired good title to the Duerers.

According to Elicofon, he acquired the Duerer portraits in 1946 when he bought them for $450 from a young American ex-serviceman, about 25 to 30 years old, who appeared at Elicofon's Brooklyn home with about eight paintings and who told Elicofon that he had purchased the paintings in Germany. Although Elicofon learned the name of the person he has since forgotten it. Elicofon had the paintings framed and hung them on a wall in his home with others. They remained there until 1966 when a friend, Stern, having seen a pamphlet containing lists of stolen artworks, informed Elicofon of their identity. At that time Elicofon made public his possession of the Duerers which precipitated a demand by the Kunstsammlungen for their return. Elicofon maintains that he purchased the paintings in good faith, without knowledge of their source or identity.

For the purpose of its motion for summary judgment, the Kunstsammlungen accepts the truth of Elicofon's version of the manner in which he acquired the Duerers. The Kunstsammlungen argues that good faith is irrelevant.

It is a fundamental rule of law in New York that a thief or someone who acquires possession of stolen property after a theft "cannot transfer a good title even to a bona fide purchaser for value [because] [o]nly the true owner's own conduct, or the operation of law . . . can act to divest that true owner of title in his property . . . ." 3 Williston, Sales § 23–12.

The Kunstsammlungen contends that the circumstances surrounding the disappearance of the Duerers leave no question that the paintings were stolen from Schwarzburg Castle where they had been stored, and that consequently Elicofon could not have acquired title to the paintings. Elicofon claims that there does exist a question as to those facts on which the Kunstsammlungen relies to establish a theft; alternatively, he claims, such a theft does not preclude a finding that Elicofon's transferor acquired good title to the paintings in Germany. Thus, the question on this motion is whether the facts about which there is no genuine dispute indicate that Elicofon bought the paintings from one who was incapable of conveying title.

### 1. The Occurrence of a Theft

On a motion for summary judgment, the moving party has the initial burden of presenting "evidence on which, taken by itself, it would be entitled to a directed verdict." *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972). The facts about which the Kunstsammlungen contends there is no dispute were related by Dr. Walter Scheidig. Until 1940 Dr. Scheidig was the Deputy Director of the Kunstsammlungen zu Weimar, and from 1940 to 1967 was the Director of the museum. The facts were told by Dr. Scheidig at a deposition conducted by counsel for all parties to this action in May, 1971;[2] in addition, various documents and letters are submitted as exhibits in support thereof. Dr. Scheidig died in 1974. The facts as told by Dr. Scheidig are as follows:

In 1943, anticipating the bombardment of Weimar, where the Kunstsammlungen is located, Dr. Scheidig had the Duerers and other works of art in the Staatliche collection transferred to a nearby castle, the Schloss Schwarzburg, in a section of which they were stored for safekeeping. Shortly after the American Forces assumed occupation of Thuringia in the spring of 1945, Dr. Scheidig wrote a letter to the U. S. Military Government in Weimar advising it of the artwork stored at Schwarzburg and other places in and around Weimar, and urged that all such depositories be secured by the Military Government (Scheidig dep. exh. 8).

On May 9, 1945, Dr. Scheidig, by letter (*Id.* Exh. 9), requested that the Thuringia Land Ministry of Education[3] secure Mili-

2. There is no doubt that deposition testimony may support a motion for summary judgment. *Western Union Tel. Co. v. N. C. Direnzi, Inc.*, 442 F.Supp. 1 (E.D.Pa.1977).

3. After the American Military assumed occupation of Thuringia, Thuringian administrative bodies remained in existence and carried out their usual duties, but under the auspices of the Military Occupation authorities.

tary Government permission for him to visit the various depositories. Permission having been granted (*Id.* Exhs. 10, 11), Dr. Scheidig drove to the Schwarzburg and other depositories on June 12, 1945 with a Ministry official. During a stop in Rudolstadt, a neighboring town about 10 miles from Schwarzburg, Dr. Scheidig learned that an American Military unit had been stationed at Schwarzburg. Upon arriving in Schwarzburg, Dr. Scheidig had a discussion with the commanding officer who handed the keys to the storeroom to a soldier who accompanied Dr. Scheidig there. Other soldiers entered the storeroom while Dr. Scheidig was present, apparently out of curiosity. On this visit Dr. Scheidig also met one Fassbender who had been living on the castle grounds. Fassbender had been employed by the Reich Government to refurbish Schwarzburg Castle for use as a summer retreat for Hitler. Dr. Scheidig noted at the deposition that Fassbender had nothing to do with the art depository.

Having found all in order and all the paintings and other items in their place on June 12, 1945, he recorded his findings in a memorandum to his files dated June 13, 1945 (*Id.* Exh. 12). In addition to writing that all was in order, Dr. Scheidig wrote that the soldier who accompanied him to the storeroom was a Princeton student who was extremely interested in the collection of art. He also wrote that during his visit, Fassbender had told him that nothing had been removed from the storeroom. Similarly, Dr. Scheidig reported that the works of art in the storeroom had been examined by the American soldiers but no disorder or destruction was caused.

On June 27, 1945, Dr. Scheidig again visited Schwarzburg Castle. This trip was a brief visit made at the behest of the U. S. Military Government for the purpose of recovering from the Castle certain personal items of a Dr. Messter before he left for the West with the American Forces. Dr. Scheidig took the opportunity to make a quick survey of the status of the art objects in the depository. Again a serviceman accompanied him. This time it appeared that an inside door had been forced open; paintings had been removed from the racks on which they rested and were lying about the room; cabinets had been forced open. The conditions, Dr. Scheidig reported, were frightening.

After this June 27 visit, Dr. Scheidig made two records of his findings. In a memorandum to his files dated July 3, 1945 (*Id.* Exh. 15), he described the disarray in the depot and reported that he complained to the commanding officer about the condition of the storeroom and was told that the guards at the Castle were not responsible for the artworks but were guarding submarine parts. The officer recommended that the artwork be removed from the Castle.

As to the Duerer paintings, Dr. Scheidig wrote in the memo: "The two Duerer pictures were not anymore in their old place and could, for the time being, not be found." The meaning of this statement as described at his deposition was that the Duerer paintings were not in their place on the racks in the depot; yet, there was insufficient time to make a thorough investigative search of the premises. Thus, "for the time being" meant "until the next thorough checking." [4]

Dr. Scheidig's June 27, 1945 visit to Schwarzburg Castle was also recorded in a letter to the Thuringian Ministry of Education dated July 5, 1945 (*Id.* Exh. 16). In the letter he reported that the doors of the depot had been forced open and cabinets and boxes opened. In support of a request for authority to remove the Kunstsammlungen's collection from the castle he wrote: "In the depot in Schwarzburg are the most

---

4. At the deposition of Dr. Scheidig this phrase, from the German "die beiden Duerer Portraits . . . konnten zunachest nicht gefunden werden," was translated to mean that the Duerers could "for the time being not be found." Elicofon claims that the translation given at the deposition was "a somewhat clumsy render-ing" of the German phrase, which he claims should read ". . . could not be found at first." Defendant's Memorandum, p. 18 n.6. In view of Dr. Scheidig's explanation of the phrase at his deposition, any dispute as to the exact translation of the phrase is irrelevant.

important pieces of art of the Land of Thuringia from the Weimar Castle Museum (paintings of Duerer, Cranach [and] Friedrich).... Losses from this depot will be irreplaceable."

The Russian Army replaced the U. S. Military in Thuringia on July 2, 1945.[5] Dr. Scheidig was able to visit Schwarzburg again on July 19, 1945, accompanied by his assistant, Dr. Marchand and another Rudolstadt official. The custodian of the Castle grounds, Ehle, was still there and reported that the depository door had been forced open and he had nailed it shut after the Americans left. The storeroom was, as before, in a shambles, now with empty frames lying about. Dr. Scheidig and his assistant inventoried the missing paintings and finally established that the Duerers were among them.

In a letter dated July 21, 1945 (*Id.* Exh. 19), Dr. Scheidig reported to the Land Ministry that certain paintings had been stolen from the art depot and attached a list of the missing paintings with exact descriptions and photographs. The Duerer portraits and another painting by Friedrich were described in the letter as "the most valuable possessions of the Land of Thuringia." Dr. Scheidig also stated that the thefts "were obviously committed by American soldiers before their departure," specifically, by the troops stationed there under Captain R.R. "Ewarr" (changed in ink to 'Estesl' (sic)). He also suggested that the architect Fassbender, who had fled to south Germany shortly before the Americans left, also could have been involved in the theft.

The theft of the Duerers and the commencement of efforts to secure their recovery prompted further correspondence in regard to them. Dr. Scheidig had much correspondence with a Dr. Zimmerman, Director of the Kaiser Freidrich Museum in Berlin. Dr. Scheidig informed Dr. Zimmerman of the theft in a memorandum dated September 30, 1945, and stated that the

discovery that the depot had been looted was made "immediately after the American troops had left on July 1, 1945." In response to two letters from Dr. Zimmerman dated September 28, 1945 (*Id.* Exh. 21) and October 10, 1945 (*Id.* Exh. 23), in which Dr. Zimmerman requested more specific information about the thefts to relay to the authorities, Dr. Scheidig wrote two letters to Dr. Zimmerman, dated October 3, 1945 (*Id.* Exh. 22) and October 12, 1945 (*Id.* Exh. 24). In the letter of October 3, 1945 Dr. Scheidig wrote that the thefts probably occurred "in the last hours before the departure of the American troops on July 1, 1945." And on October 12 he identified the troops stationed at Schwarzburg as "of the 15 American Inf. Division under the command of Capt. Paul Estes ... [who] had the key to the depository in his possession...."

In a letter dated March 22, 1946 to Dr. Carl Mueller of the Bavarian National Museum in Munich, (*Id.* Exh. 28) Dr. Scheidig wrote that the paintings had been stolen "at the time of the departure of the American troops."

In a memorandum dated September 6, 1948 for transmittal to the Soviet Military Administration, (*Id.* Exh. 30), Dr. Scheidig charged that the Americans under the command of Captain Paul Estes were responsible for the theft, noting that footprints and cigarette butts of Americans were left behind in the storeroom. Dr. Scheidig stated that the paintings were determined to be missing "on July 19, 1945, after the departure of the American troops."

In January 1961, Dr. Scheidig recounted the circumstances surrounding the disappearance of the Duerers in a memorandum and letter written to Ms. Ardelia Hall, a United States State Department official in charge of the program to locate the missing artworks. The account is substantially the same as prior accounts except that in the

---

**5.** United States Army Records show that Russian troops replaced the Americans in "Landkreis Rudolstadt" at about midnight on July 2, 1945. (Sabel Afft. Exh. 1). The *Thuringer Volkszeitung*, a local newspaper, reported the

entry of Russian troops into Gera, which is about 30 miles east of Weimar, also on July 2, 1945. By July 16, 1945, the Soviet political machinery was in place and had appointed a new President of Thuringia.

1961 letter Dr. Scheidig wrote that on June 27, 1945 when he visited the castle the paintings were "no longer in the repository," as opposed to "no longer in their old place," as he had stated in the memorandum of July 3, 1945. In addition, Dr. Scheidig added to the account that the soldier who accompanied him to the storeroom on June 27 specifically asked him about the Duerer portraits and that Dr. Scheidig and the officer reported to the commanding officer that the paintings were missing, not only that the room was in a shambles, for which the commander is said to have disclaimed responsibility. Similarly, at the deposition in 1971, Dr. Scheidig stated that it was his belief that the paintings had already been stolen on June 27, and that the commanding officer was told that the paintings were missing.

Although Dr. Scheidig, in 1961 and 1971 was convinced that the Duerers had already been stolen on June 27, 1945 when the storeroom was in a shambles and the paintings were not in their places on the racks, the Kunstsammlungen does not adopt the version since a thorough examination of the storeroom could not be made on that day. The Kunstsammlungen only asserts that it is clear from Dr. Scheidig's testimony and the supporting documents that the Duerers were stolen sometime between June 12, 1945, when Dr. Scheidig last saw them in the storeroom, and July 19, 1945, when the theft was finally established.

Elicofon claims that the Kunstsammlungen has failed to carry its initial burden of presenting a *prima facie* case because internal inconsistencies in Dr. Scheidig's various accounts raise a question of his credibility. We disagree. We find no significance in the inconsistencies in Dr. Scheidig's various accounts. And, unlike Elicofon, we find that Dr. Scheidig's explanations at the deposition of any ambiguities in his past correspondence were consistent with what is already apparent to a reasonable person from the Kunstsammlungen's records and Dr. Scheidig's deposition testimony.

Elicofon is primarily concerned with inconsistencies in Dr. Scheidig's accounts as to when the theft occurred. Thus, in the documents of July 3 and July 5, Dr. Scheidig made no mention of a theft and, in fact, included the Duerers in a list of paintings located at Schwarzburg, but on July 21, 1945 and thereafter, up to 1961, Dr. Scheidig wrote that the theft was carried out by the Americans upon their departure from Schwarzburg on July 1, 1945; and in the letter of 1961 and at the deposition in 1971, Dr. Scheidig stated that the paintings were no longer in the repository on June 27, 1945, which fact was reported to the commanding officer.[6]

Not having had the opportunity to check the depot thoroughly on June 27, 1945 it is reasonable that Dr. Scheidig did not officially report to the Thuringian Ministry in the letter of July 5 that the theft had occurred. As to why, in his request for permission to move the collection from Schwarzburg he listed the Duerers as among the paintings located at Schwarzburg, Dr. Scheidig explained: "In order to point out the urgency of the shipping, I just mentioned a few painters, in order to point to the fact how precious the collection is, without wanting to say or to express that at that point of time the pictures were still there." On the other hand, it is also reasonable for Dr. Scheidig to have complained to the commanding officer of the theft on June 27 without being certain that a theft had in fact occurred, since the officer ostensibly had the power to secure their return. Thus, the documents of July 3 and July 5 are not inconsistent with Dr. Scheidig's belief in 1961 and 1971 that the theft had already occurred by June 27.

6. We reject Elicofon's attempt to attach some significance to the variations in Dr. Scheidig's accounts by suggesting that Dr. Scheidig changed his account of July 3 and July 5 to that of July 21 and thereafter in order to curry favor with the Russians. Elicofon would have us believe that Dr. Scheidig who for the purpose of suggesting such a motive Elicofon describes as a "bureaucrat by profession" was on July 3 and July 5, after the Russians had already marched into Thuringia, ignorant of the fact that the Russians were to assume power in Thuringia.

Nor are the statements in the documents of July 21, 1945 up to 1961 inconsistent with the 1961 letter and 1971 deposition. The descriptions in the correspondence of the date by which the theft occurred by no means exclude June 27 since it was soon "before the Americans departed from Schwarzburg on July 1," and may be described figuratively as "the last hours" before their departure.

It is apparent from the frequent correspondence concerning the theft of the Duerers that Dr. Scheidig gave much thought to the circumstances surrounding the theft. Thus, it is quite understandable for Dr. Scheidig to have finally concluded sometime after 1945 that the Duerers, missing from their racks on June 27, had probably already been stolen at that time. Indeed, Dr. Scheidig noted at his deposition the use of the phrase "in the last hours" before the departure of the Americans to describe the time of the theft was based on the impression gained on the July 19 inspection when empty frames were lying about, whereas on June 27 no empty frames were lying about.[7]

Having rejected as a matter of law Elicofon's assertions of the existence of internal inconsistencies in Dr. Scheidig's account which create a credibility issue, we find as a matter of law that the Kunstsammlungen has presented a *prima facie* case establishing that the Duerers were stolen from Schwarzburg sometime between June 12 and July 19, 1945.

Once the party moving for summary judgment has presented evidence which would sustain a directed verdict, the burden shifts to the party opposing the motion to offer competent evidence which "raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts." *Beal v.*

*Lindsay,* 468 F.2d 287, 291 (2d Cir. 1972); *First National Bank of Cincinnati v. Pepper,* 454 F.2d 626 (2d Cir. 1972).

The evidence presented by Elicofon which he purports raises a substantial question of the veracity of plaintiff's case consists of the affidavits of former officers of Company F, 2d Battalion, 406th Infantry Regiment, 102nd Division, which was stationed in the town of Schwarzburg above which stood the promontory on which the Castle was situated. The affidavits submitted are those of Lieutenants Cecil A. Wooten, Clinton Walters and John Gwynn, and Captain Paul Estes.

The essence of the statements made by the three lieutenants is that they never met or heard of Dr. Scheidig and never heard of any missing paintings; that they never heard Dr. Scheidig report the theft of the Duerers to the Captain in the presence of a lieutenant despite Scheidig's statement that he did so; that they didn't know paintings were stored at the Castle although one remembers hearing of the picture of a child with a fly on his nose (Cranach's "Venus with Amor," also reported missing by Dr. Scheidig) and one remembers seeing paintings in crates in one building and machine parts in an adjoining building. All express the belief that they would have been informed of missing paintings. Most of the officers recall the architect Fassbender. Captain Estes reports that he recalls seeing the painting "Venus with Amor" and an antique pistol; and that upon seeing the antique pistol he placed the castle off limits and posted a guard at one entrance. He too states that he never met or heard of Dr. Scheidig. He recalls Fassbender, with whom he and Lieutenant Gwynn played bridge on a number of occasions.

---

7. Unlike Elicofon, we find no significance in Dr. Scheidig's statement that "the visit of 27th June had established the fact that the pictures were missing because of *empty frames*." As Elicofon notes, this was the first time that Dr. Scheidig ever mentioned *empty frames* in connection with the June 27 visit. At all prior times, Dr. Scheidig stated that the paintings were missing from their racks in the storeroom on June 27. First, we note that Dr. Scheidig at the deposition, did not say that empty frames were lying about, like they were on July 19. Thus, he could well have been thinking of the empty space on the racks where the paintings had been located, which established that they were missing on June 27, and mistakenly said empty frames, since in the statement he was comparing his findings of June 27 with those of July 19.

Elicofon's purpose in presenting the affidavits of the lieutenants is to show that if Dr. Scheidig were being truthful about his visits to the Castle and the paintings, one of these officers would have known him, or at least, would have known about the missing paintings.[8] We find that the statements of Lieutenants Walters, Wooten and Gwynn are totally irrelevant to the issues of whether Dr. Scheidig visited the Castle or whether he reported the theft of the Duerers to the commanding officer.

Dr. Scheidig never reported that on his visits to the Castle he met officers of Company F, with the exception of the "Captain" and a lieutenant. He only reported that curious soldiers accompanied him to the storeroom to view the paintings. The statements of three officers that they never met or knew of Scheidig out of the many soldiers of Company F certainly cannot be taken as probative of whether Dr. Scheidig visited the Castle.

The statements of these officers in their affidavits that they would have been informed by the Captain if a theft of a valuable painting had been reported is directly contradicted by the prior statements of Lieutenants Walters and Wooten and Captain Estes made to Army investigators during a formal Army investigation in 1954 of the thefts at Schwarzburg. Captain Estes had reported to Army investigators that prior to leaving Schwarzburg he had discovered that the painting "Venus with Amor" was missing and had conducted an investigation to recover it. Lieutenants Walters and Wooten had no knowledge of that theft or investigation. Without some proof that these officers would have known of the theft if it had been reported the statements that these officers did not know of the theft are without foundation and irrelevant.

As to why none of the lieutenants recall Dr. Scheidig to have reported the theft of the Duerers in their presence in view of Dr.

Scheidig's statement that he reported the theft to the Captain in the presence of a lieutenant, we note first that only three of the four lieutenants of Company F submitted affidavits. Second, we note that the Commander of the entire Battalion that included Company F was a *Lieutenant* Colonel Gatlin. This might have been the lieutenant to whom Dr. Scheidig referred. Indeed, although at his Army investigation interview Lieutenant Gatlin did not recall it, Captain Estes reported to the investigators that he was with Lieutenant Gatlin on a visit to the Castle when he discovered that the "Venus with Amor" was missing.

In the absence of any proof that these officers would have known of the reported incidents the statements that they could not remember them, which we note are not contradictory but merely do not support Dr. Scheidig's account, are of no significance.

Neither does the statement of Captain Estes that he does not recall Dr. Scheidig raise a question of Dr. Scheidig's credibility. The first time Dr. Scheidig mentioned Captain Estes by name was in his letter of July 21, 1945 to the Thuringian authorities in which he reported the theft of the paintings and identified the troops responsible for the theft as being under the command of Captain R. R. "Ewarr". Thus, we may venture a guess that it was not with Captain Estes that Dr. Scheidig met. Dr. Scheidig having so concluded upon learning that Estes was the Captain of Company F. In any event, the fact that Captain Estes does not remember Dr. Scheidig is not necessarily inconsistent with Dr. Scheidig's account that he met Captain Estes. Even if an issue exists on this point, it is in itself immaterial to the issue of the occurrence of a theft and will not preclude the granting of summary judgment. *Adickes v. S. H. Kress & Co., supra*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142. The mere statement by Captain Estes is presented in the face of a

---

8. Elicofon also notes that no member of Company F has ever been identified as a Princeton student despite Dr. Scheidig's notation in his memorandum of June 15, 1945 that the American soldier who accompanied him to the depot after getting the keys from the commanding officer, was a Princeton student. Elicofon does not state in certain terms that no member of Company F was a Princeton student and does not indicate whether even if a soldier in Company F were a Princeton student what would be the likelihood of identifying him.

volume of contemporaneous memoranda, letters, and records of traveling expenses, all consistent, offered by Dr. Scheidig, in addition to his recollection of facts about Schwarzburg Castle which coincides with facts related by the officers of Company F. Moreover, Dr. Scheidig's repeated statement that the Americans were responsible for the theft is consistent with Elicofon's statement of many years later that he acquired the Duerers in 1946 from an American ex-serviceman. "[T]he party opposing summary judgment must be able to point to some facts ... [that will] refute the proof of the moving party in some material portion," and not "merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Rinieri v. Scanlon*, 254 F.Supp. 469 (S.D.N.Y.1966). Elicofon has failed to do so.[9]

We find the theft of the Duerers from Schwarzburg Castle between June 12 and July 19, 1945 is beyond dispute.

### 2. The Architect Fassbender

#### a) German Law of Good Faith Acquisition

Elicofon argues that even if the Duerers were stolen from Schwarzburg Castle, Elicofon could have acquired good title to the paintings. From the facts told by Dr. Scheidig, Elicofon asserts, it can be inferred that the architect Fassbender, who lived on the Castle grounds and who Dr. Scheidig suspected was involved in the theft, stole the paintings. Elicofon argues that under the German law of "good faith acquisition" Fassbender could have transferred good title to an innocent purchaser

in Germany even though he did not himself have good title; and the good faith purchaser or his transferee, in turn, could have transferred good title to Elicofon. Thus, it is argued that a fact question is presented as to whether Fassbender stole the paintings. The question of fact as to Fassbender's role in the theft is immaterial because Fassbender could not have conveyed good title under the law of good faith acquisition.

The rules of German law governing the "good faith acquisition"[10] of title in chattels from a thief are derived from provisions of the German Civil Code. The code provisions relating to the transfer of movables are contained in BGB §§ 926–36. BGB § 932 provides:

(1) By virtue of a transfer effected in accordance with § 929, the acquirer also becomes the owner when the thing does not belong to the seller, unless he is not in good faith at the time when, by virtue of these provisions, he would acquire ownership. In case § 929, Sent.2 applies this, however, is applicable only if the purchaser had obtained possession from the disposer.

(2) The acquirer is not in good faith if he knows, or owing to gross negligence does not know, that the thing does not belong to the disposer.

Section 935 limits the application of § 932:

(1) The acquisition of ownership based on §§ 932–34 does not take place, if the thing has been stolen from the owner, becomes missing or otherwise lost. The same applies, where the owner was only an indirect possessor, if the thing was lost by the possessor.

---

**9.** Even if ordinarily we would deny summary judgment simply to afford a jury or court an opportunity to view the demeanor of a witness whose credibility is challenged, such a justification does not exist in this case since Dr. Scheidig has already been cross-examined and has since died. *E.g., Campbell v. American Fabrics Co.*, 168 F.2d 959 (2d Cir. 1948).

**10.** The issue of foreign law is a question of law. Fed.R.Civ.P. 44.1. In deciding an issue of foreign law a court may consider any relevant material or source. *Kalmich v. Bruno*, 553 F.2d

549 (7th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

On the issue of the German law doctrine of acquisition of title from a thief by a good faith purchaser, Elicofon submits the following affidavits:

 Ernest C. Stiefel (1/80) §§ 12–18
 Ernest C. Stiefel (6/80) §§ 9–36

The Kunstsammlungen submits the following affidavits:

 Hans W. Baade (4/80) §§ 10–26
 Hans W. Baade (7/80) §§ 3–14
 Martin Posch (4/80) §§ 5–6

The basic operation of the sections has been summarized as follows in Medicus, Federal Republic of Germany, 6 *Int'l. Encyclopedia of Comparative Law* F–11 (1979):

> Good faith acquisition from a non-entitled party is possible where the transferor is in possession of movable property (§ 932–936). . . . In the case of movable property, however, the transferred [sic] is defeated by gross negligence (§ 932 par.2) as well as . . . by the fact that the property was taken from the entitled party without his consent (§ 935).

Under the cited provisions of German Law, a purchaser acquires good title to property even if the seller has disposed of the property in violation of a fiduciary obligation under which he acquired possession, *i.e.*, even if the seller does not have title, unless the circumstances in BGB § 935 are present. The rule allowing one to acquire good title in the defined circumstances derives historically from the principle of Germanic law that "he who trusts another person has to seek redress for breach of trust not from third parties, but from the object of his confidence." M. Wolff, *Sachenrecht* 205–06 (7th ed. 1927).

Both Elicofon and the Kunstsammlungen agree, at least on a superficial level, on the elements required to acquire ownership from one who has no title: (1) the owner must have voluntarily parted with his dominion over the paintings, *i.e.*, the paintings must not have been taken from the owner without his consent; (2) the person from whom the purchaser acquired the paintings must have been in possession of them; and (3) the purchaser must have believed in good faith that that person was the actual *owner* of the paintings, and that belief must not have been grossly negligent. 3 Staudinger, *Kommentor Zum Burgerlichen Gesetzbuch*, 658, § 932 n.26 (11th ed. 1956). They differ, however, on whether these elements were satisfied in this case.

The first element about which the parties disagree is whether Fassbender was in "possession" of the paintings within the meaning of BGB § 932, and, therefore, capable of transferring good title. German law distinguishes among three types of possession—indirect possession ("*mittelbarer Besitz*"), direct possession ("unmittelbarer Besitz") and the mere exercise of physical control by a so-called possessor's servant ("Besitzdiener"). An indirect possessor is one who has immediate and authorized access to property, and may, in turn authorize another to exercise actual control over such property; an indirect possessor does not himself have physical custody of the property. A direct possessor is one who exercises control over property in his physical possession pursuant to the authorization of an indirect possessor. A possessor's servant is one who exercises actual control over property for another in a relationship in which he is required to comply with the other's instructions concerning the property; a possessor's servant does not acquire "possession" in the legal sense, that is, does not have actual power of control over a thing, BGB § 854, which remains with the direct or indirect possessor.

Elicofon argues that Fassbender was a possessor or a possessor's servant and, therefore, was capable of transferring title to the paintings to a good faith purchaser. In support of the assertion that Fassbender was either a possessor or a possessory servant Elicofon cites the following: First, in his 1961 letter to Ms. Hall, Dr. Scheidig referred to the 1955 letter sent by Ms. Hall to Dr. Scheidig in which she informed him that she had spoken with people who belonged to the occupation forces and who had an inkling of the gossip of the works of art and who knew of the German architect who lived on the Castle grounds and "took care of" the works of art.[11] As an indica-

---

11. The Kunstsammlungen asserts that the phrase put in quotes by Dr. Scheidig "Bekummern" really means that Fassbender "concerned himself with" the artworks, and that by placing the word in quotations Dr. Scheidig meant to imply, in an ironic tone, that the person whose attitude is referred to in truth had no real concern for the matter, but merely pretended concern. In fact, in making the determination that Fassbender was a possessor of the paintings, Elicofon's expert did not have the letter before him, but only had the translation

tion of Fassbender's possession Elicofon also refers to Captain Estes' statement in his affidavit that Fassbender "appeared to be in charge of" the Castle and its contents.

The evidence offered by Elicofon in support of his conclusion that Fassbender was either a Besitzer or Besitzdiener of the artwork is so insubstantial and does not raise a genuine issue of fact. In any event there exist countervailing facts which surely put the issue to rest. Dr. Scheidig testified that before the U.S. Military took control in Schwarzburg, the storeroom was in the custody of a Platzmeister, guard, who lived at the Castle; and that a museum official of Rudolstadt had the duty to come to Schwarzburg in short intervals. Even if we were to find, and we do not, that there existed some question as to Fassbender's role at the Castle before the American occupation, no evidence has been offered of his authority over the paintings after Captain Estes assumed complete control over the storeroom in Schwarzburg Castle. Even Dr. Scheidig had to secure permission and get the key from the Americans before entering the storeroom; and permission was not secured from nor was the key in the possession of Fassbender. Captain Estes' statement that Fassbender "appeared" to be in charge of the Castle could only relate to a time before the Americans arrived; once the Americans assumed power Captain Estes took the key to the storeroom and posted the guard at the Castle. Finally, Dr. Scheidig testified at his deposition that Fassbender had no responsibility or duties in connection with the depository. The conclusory assertion that Fassbender was in charge of the artwork will not serve to create a fact question. *Dressler v. M. V. Sandpiper*, 331 F.2d 130, 134 (2d Cir. 1964).

Even assuming Fassbender was a *de facto* custodian of the artwork whose assumption of caretaking duties had been ratified by the appropriate officials, he still would not have been capable of transferring good title. Under the German law of good faith

acquisition, only a "possessor" ("Besitzer") in the legal sense and not a "possessor's servant" ("Besitzdiener") can transfer title to a bona fide purchaser under BGB § 932. As a custodian of the artwork Fassbender would have been a public servant; and public servants are, as the very term suggests, persons acting at the discretion of another, *i.e.*, of their superiors and, ultimately of the State which they serve. Therefore, German courts, commentators, and treatise writers are unanimous in the view that civil servants are not possessors but rather possessory servants of the State properties under their charge. 3 Staudinger, *Kommentar zum Burgerlichen Gesetzbuch*, 40, § 855 (11th ed. 1956); F. Baur, *Lehrbuch des Sachenrechts* 58 (4th ed. 1968).

We reject Elicofon's position that a public servant could be a Besitzer. According to Elicofon and the authority on which he relies, in order to be a Besitzdiener, one must be "totally subordinate" to another, Heck, *Grundriss des Sachenrechts*, § 7.3 (2d ed. 1960), the relationship being categorized as one of "command and obedience", Wolff-Raiser, *Lehrbuch des Burgerlichen Rechts Sachenrecht* (10th ed. 1957). He argues that the evidence does not show that Fassbender was "totally subordinate" to another but rather that he exercised some measure of independent control over the Castle and its contents. There is no evidence that Fassbender exercised control to the extent of a Besitzer. In any event, to find that a public servant could achieve the status of a Besitzer would be in conflict with controlling German law and policy.

We also reject Elicofon's argument that even a Besitzdiener can transfer good title to a bona fide purchaser, if the chattel was transferred to the possessor's servant ("Besitzdiener") under conditions conveying the outward appearance of a transfer of legal possession. Elicofon argues that such a transfer is sufficient to supply the element of voluntary parting with possession by the owner which characterizes a transfer of

given him by Elicofon. This Dr. Stiefel noted: "In determining the legal effect to be given to Dr. Scheidig's words, it would be helpful if his

original German statement could be examined."

possession to a Besitzer. In other words, Elicofon contends that a good faith acquisition is possible from a possessor's servant whose social dependence is not apparent to his purchaser. In support of this view Elicofon cites numerous authorities and a decision of the Court of Appeals (Oberlandesgericht, "OLG") dated March 23, 1949, reported in 1949 *Neue Juristische Wochenschrift* 716.

The view advanced by Elicofon is the view of the minority. Because a Besitzdiener does not have legal possession of a chattel in his custody, *i.e.*, the possessor never voluntarily parted with dominion over it as required under BGB § 932, when the Besitzdiener illegally sells the chattel it becomes *abhanden zekommen, i.e.*, stolen, missing or otherwise lost, within the meaning of BGB § 935. A good faith acquisition under BGB § 932 is not possible thereafter.

We disagree with Elicofon's reading of the cited decision. His interpretation is not consistent with two decisions of the Reich Supreme Court, 71 RGZ 248 (1909) and 106 RGZ 4 (1922) in which it was held that a good faith purchaser cannot acquire good title from a Besitzdiener. The decision of the Court of Appeals presented the following facts: Plaintiff owned a transportation enterprise. In March 1945, while the Soviets were preparing to occupy East Germany, he sent his coachman, S, with two teams of horses towards the West. S was unable, due to circumstances beyond his control, to maintain the route designated by the owner. In December 1945, S had to sell one of the teams to buy food for the other. The buyer believed in good faith that S was the owner of the horses. Plaintiff sought to recover possession from the buyer. The court held that the plaintiff was not entitled to the horses. The Kunstsammlungen offers a translation of the relevant portions of the opinion which is not contested:

> In the instant case, the plaintiff entrusted his coachman, S, with two teams of horses—a substantial amount of property—with the task of carrying that property to safety. . . . He was aware, in this connection, that he was sending (S) and the teams of horses into an uncertain fate, given the increasingly chaotic military situation, and that he was giving up, for an indefinite period of time, the possibility of disposing of this property. He had to take into account, additionally, that S could find himself, due to unforeseeable events, in the situation where the loss of property would be unavoidable. Therefore, he also must have been aware that by conferring the task on S, he was placing the latter in a position which required him to make important decisions in such situations. . . .

1949 *Neue Juristische Wochenschrift* at 717. The Court proceeded on the traditional assumption that S, the coachman, had initially been a possessory servant, a Besitzdiener, because of the master-servant relationship. However, it found that the master-servant relationship was replaced by a contractual relationship when plaintiff entrusted S with the horses in the circumstances described by the court, by virtue of which S became a "direct possessor". The decision does not stand for the broad proposition that a possessor's servant with apparent authority may be treated as a possessor, as Elicofon contends. Rather, the Court found that he *was* a possessor; that the owner himself had actually released so much authority to S that he could not later maintain that S had no such authority. In other words, the Court looked to the intention of the owner and not to the perception of the third party. This ruling is consistent with the historical principle on which good faith acquisition is based—that he who trusts another has to seek redress from the object of his confidence, and not from third parties.

We conclude that even if Fassbender had been in charge of the paintings, he nevertheless could not have transferred title to a bona fide purchaser because as a Besitz-

diener he would have lacked the element of "possession" required under BGB § 932.

We find that under German law even if Fassbender removed the paintings from Schwarzburg Castle a transferee from Fassbender could not have acquired nor conveyed good title to the paintings.

### 2b. *Military Government Law No. 52*

 The Kunstsammlungen alternatively asserts that Fassbender could not have conveyed title under the German law of good faith acquisition because Military Government Law, which superseded the German law,[12] rendered void any transfer of cultural property.[13] We agree.

Law No. 52 was an Allied Military Law which was promulgated by the Allied Forces in their respective zones of occupation. It provided, in pertinent part:

#### Article I (1)

All property within the occupied territory owned or controlled, directly or indirectly, in whole or in part, by any of the following is hereby declared to be subject to seizure of possession or title, direction, management, supervision or otherwise being taken into control by Military Government:

a) The German Reich, or any of the Laender, Gaue, or Provinces, or other similar political subdivisions or any agency or instrumentality thereof, including all utilities, undertakings, public corporations or monopolies under the control of any of the above:

#### Article II

[E]xcept as otherwise authorized or directed by the Military Government, no person shall import, acquire or receive, deal in, sell, lease, transfer, export, hypothecate or otherwise dispose of, destroy or surrender possession, custody or control to any property ... (d) which is a work of art or cultural material of value or importance, regardless of the ownership or control thereof.

#### Article V

Any prohibited transaction effected without a duly issued license or authorization from Military Government, and any transfer, contract or other arrangement made, whether before or after the effective date of this law, with intent to defeat or evade this law or the powers or objects of Military Government or the restitution of any property to its rightful owner, is null and void.

There is no question that if Military Government Law No. 52 had been in effect in Germany at the time of the alleged removal of the Duerers by Fassbender the transfer of good title would have been impossible.[14] Elicofon asserts that Law No. 52 was never promulgated in Thuringia; that it was not in effect at the time of the alleged removal of the paintings by Fassbender; and that, in any event, its promulgation was illegal.

We reject Elicofon's assertion that the American Military Occupation Forces did not have the authority to promulgate Law No. 52 in Thuringia. Elicofon argues that as early as 1944 Thuringia was allotted to

---

**12.** It is a well settled principle of international law that when a new government takes control over a territory, the law of the former sovereign remains in effect unless replaced by the new as "the law of the land." *Fremont v. United States,* 58 U.S. (17 How.) 542, 15 L.Ed. 241 (1855); *United States v. Perot,* 98 U.S. (8 Otto) 428, 25 L.Ed. 251 (1879); *United States v. Chaves,* 159 U.S. 452, 16 S.Ct. 57, 40 L.Ed. 215 (1895); *See* Whiteman, Digest of International Law 539. Thus, unless Military Law No. 52, legally promulgated, replaced the

German law of bona fide acquisition by making all transfers of public property illegal, the German law of good faith acquisition would still have been in effect when Fassbender purportedly stole the paintings.

**13.** On the issue of Military Law No. 52, Elicofon submits the following affidavits:

| Ernest C. Stiefel | 6/80 | § 38 |
| Wolfgang Seiffert | 6/80 | §§ 3 to 10 |

---

**14.** See note 14 on page 844.

Soviet Occupation and, therefore, the American Occupation authorities had no authority to promulgate orders and resolutions during the period of its occupation of Thuringia before the Soviets took control. However, the Allied Powers Agreements of September 1944 and November 14, 1944 and Statements of June 5, 1945, spoke of the zonal partition of Germany in the future, after the defeat of Germany. In accordance with the Agreements the Soviets took control in the allotted area in late June and early July, 1945. Only in August, 1945 was it established at the Potsdam Conference that Germany had been divided into four zones of occupation with supreme authority being exercised by the Commanders in Chief of the occupying armed forces, each in his own zone of occupation. It has not been suggested by Elicofon that the Americans occupied Thuringia in contravention of Allied Agreements. Indeed, the American forces occupied Thuringia with the approval of the Allied Powers, and the promulgation of Law No. 52 was to effectuate the Allied policy embodied in Law No. 52 to protect public art treasures in accordance with principles of international law. But the authority of the U. S. Military to issue Law No. 52 derived more fundamentally from the fact of its occupation of Thuringia. Elicofon's suggestion that the United States had no authority to issue any orders in Thuringia to effect Allied Policy and to maintain order generally simply because its occupation of Thuringia was known to be temporary is without foundation in law; such a rule would have undermined the maintenance of any order whatsoever in occupied territory until the Soviets' took control.[15]

Next, we reject Elicofon's claim that Law No. 52 was not actually promulgated in Landkreis Rudolstadt of which Schwarzburg was a constituent part. Allied Law No. 52 was issued in April 1945 and was to become effective in every city, town and hamlet occupied by the Allied Forces in their respective areas by posting it on the walls. Doelle and Zweigert, *Gesetz Nr. 52 ueber Sperre und Beaufsichtigung von Vermoegen* (Law No. 52 Relating to the Blocking and Control of Assets) 339–40 (1947). A "Notice" issued at Rudolstadt on April 19, 1945 by the Mayor of the City (Hofmann Afft. Exh. A) announcing that pursuant to order of the Commander of the Allied Forces in Rudolstadt, the local authorities were to continue in service; this notice demonstrates that Rudolstadt was occupied by April 19, 1945. On April 20, 1945 a "Notice" issued by the Mayor of Rudolstadt (Hofmann Afft. Exh. B) announced that all property of the Reich and Lands was under

The Kunstsammlungen submits the following affidavits:

| | | |
|---|---|---|
| Hans W. Baade | 4/80 | §§ 27–30 |
| Hans W. Baade | 7/80 | §§ 19–21 |
| Martin Posch | 4/80 | §§ 5–6 |
| Bernard Graefrath | 4/80 | § 15 |
| Manfred Hofmann | 8/80 | pp. 2–4 Exh. A–F |

14. We reject Elicofon's suggestion that Law No. 52 did not render the good faith acquisition of the paintings null and void but merely suspended the validity until the law went out of effect, at which time it was rendered retroactively valid. The rule cited by Elicofon applies only to executory contracts relating to the transfer of property subject to Law No. 52, but has no application to completed property transfers. This is because once the transfer has taken place there is no continuing intent to effect such a transfer and, therefore, nothing to be validated by the removal of the impediment.

15. Elicofon cites the case of *Carl Zeiss Stiftung v. Veb Carl Zeiss Jena,* 433 F.2d 686, 691 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) in support of his view that the U. S. Occupation authorities had no authority to promulgate Law No. 52. In that case, the Second Circuit questioned the authority of the United States Armed Forces to attempt on June 9, 1945 to set up a provincial government and appoint a Prime Minister of Thuringia when Thuringia had been allotted to Soviet occupation on June 5, 1945. We believe there is a monumental difference between the setting up of a provincial government in an area which has been allotted to occupation by another, on the one hand, and the issuing of Military Orders for the maintenance of order and, specifically, the protection of public treasures in an area, on the other. The latter is a matter of necessity while the former may be viewed as an assertion of authority with a degree of permanence. We find the Second Circuit's comments in *Carl Zeiss* regarding the provisional government to be wholly inapplicable to the issue presently before us.

sequestration by the Military Government.[16] Thus, on April 20, 1945 Law No. 52 was made effective in Rudolstadt.

Finally, we reject Elicofon's assertion that Law No. 52 which was promulgated by the Americans went out of existence once the American troops withdrew from Schwarzburg on July 1, 1945 thereby removing the restriction on the paintings and allowing Fassbender to convey good title under the German law of good faith acquisition. The continued effectiveness of Law No. 52 did not depend upon the continued presence of the United States Military Government for its legal force in Thuringia. The international law principle of continuity of laws dictates that upon a change in sovereignty the laws of the former sovereign remain in effect until displaced by the laws of the new sovereign.[17] We see no reason that the principle should not extend to laws promulgated by a temporary occupation government to maintain order and, in this case, to protect the art treasures belonging to the people of the territory. We also note again in this context that Law No. 52 was an implementation of the policy of the Allied Powers generally, and not just the United States, and was simply posted by the U. S. Military in accordance with Allied instructions; therefore, its force may be deemed to have depended upon Allied and not necessarily United States authority. Therefore, Military Law No. 52 remained in force in Schwarzburg even after the U. S. Military left the area and the Soviets took control. On October 30, 1945 the Soviet Military Administration issued Order No. 124 which also sequestered property of the German Reich and its central local authorities. It was not until Soviet Order No. 124 went into effect and continued the former American sequestration that the American Order No. 52 became ineffective. Thus, we find no gap in the effectiveness of seques-tration orders in Schwarzburg during which time the paintings could have been removed and sold.

In conclusion, we find that the facts that are not genuinely in dispute establish that the Duerers were stolen from Schwarzburg Castle between June 12 and July 19, 1945. Even if, as Elicofon suggests, Fassbender was the thief, he could not have conveyed good title to a bona fide purchaser because of the failure to meet the requirements under the German law of good faith acquisition and because Military Law No. 52 and Soviet Order No. 124, in any event, precluded the transfer of good title.

### B. Elicofon's Motion for Summary Judgment

#### 1) ERSITZUNG (Usucaption)

Elicofon asserts acquisition of title under the German law doctrine of *Ersitzung*, codified in BGB §§ 937–945. Under the doctrine of *Ersitzung*, title to movable property may be obtained by a good faith acquisition of the property plus possession of it in good faith, and without notice of a defect in title, for the statutory period of ten years from the time the rightful owner loses possession. The Kunstsammlungen contends that Elicofon's possession does not satisfy the requirements of *Ersitzung* because (1) *Ersitzung* is inapplicable to "people's property" such as the paintings and (2) the ten-year period was broken by the period during which the German Democratic Republic was not a recognized government of Germany.

■ We need not reach the substantive issues in connection with the doctrine of *Ersitzung* because under New York choice of law theory, German law is not applicable to determine whether Elicofon acquired title to the paintings. New York's choice of law dictates that questions relating to the

16. The Notice of the Mayor was written in German. According to Elicofon the posting of Law No. 52 was required to be written in either English or French, and not in German. Even if this were the case we would regard the submission of the announcement of Law No. 52 in German as persuasive and uncontradicted evidence that Law No. 52 was indeed promulgated in Rudolstadt. In any event, Elicofon points to nothing in the text of the law to indicate that its promulgation was ineffective if issued in German.

17. See citations in footnote 12 of this opinion, *supra*.

validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer. *Wyatt v. Fulrath,* 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E.2d 637 (1965); *Zendman v. Harry Winston, Inc.,* 305 N.Y. 180, 111 N.E.2d 871 (1953); *Hutchison v. Ross,* 262 N.Y. 381, 187 N.E. 65 (1933); *Goetschius v. Brightman,* 245 N.Y. 186, 156 N.E. 660 (1927); Restatement (Second) of Conflict of Laws § 246 (1971).

The refusal by the New York Court of Appeals to apply the "place of injury" test in the tort field, *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), does not dictate a different result here. This is because the choice of law rule advanced in the cited cases and adopted in Section 246 of the Restatement incorporates the concept of "significant relationship." Section 222 of the Restatement which enunciates the general rule for determination of choice of law questions before reaching types of transfers provides:

> The interests of the parties in a thing are determined, depending upon the circumstances, either by the "law" or by the "local law" of the state which, with respect to the particular issue, *has the most significant relationship to the thing and the parties* under the principles stated in § 6. (emphasis supplied).

In addition, comment (a) to Section 246 provides that "[t]he state where a chattel is situated has the dominant interest in determining the circumstances under which an interest in the chattel will be transferred by adverse possession or by prescription."

The same result would be reached if we were to apply the "significant relationship" analysis to the facts of this case. The New York Court, in embracing an interest analysis test, has by no means rejected the *lex loci delicti* rule. Recently, the Court of Appeals held that the place of injury "remains the general rule in tort cases to be displaced only in extraordinary circumstances." *Cousins v. Instrument Flyers, Inc.,* 44 N.Y.2d 698, 699, 405 N.Y.S.2d 441, 442, 376 N.E.2d 914, 915 (1978). In this case, Germany's "connection with the controversy" is not sufficient "to justify displacing the rule of *lex loci delictus.*" *Neumeier v. Kuehner,* 31 N.Y.2d 121, 129, 335 N.Y.S.2d 64, 71, 286 N.E.2d 454, 458 (1972). The fact that the theft of the paintings occurred in Germany is totally irrelevant to the policy of *Ersitzung* to protect bona fide purchasers so as to promote the security of transactions. Such a concern does not extend to transactions which take place beyond its borders.

In contrast, the contacts of the case with New York, *i.e.,* Elicofon purchased and holds the paintings here, are indeed relevant to effecting its interest in regulating the transfer of title in personal property in a manner which best promotes its policy. The fact that the theft of the paintings did not occur in New York is of no relevance. In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the theft took place, but simply whether one took place. Similarly, the residence of the true owner is not significant for the New York policy is not to protect resident owners, but to protect owners generally as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods. In finding that New York law governs the question of title, we hold that Elicofon did not acquire title under *Ersitzung.*

## 2. *Timely Commencement of Action*

### a. *Statute of Limitations*

It is not disputed that Elicofon acquired the Duerers in 1946; that the Kunstsammlungen, upon discovering that Elicofon had them, demanded return of the paintings and Elicofon refused to return them in October 1966; and that in April 1969 the Kunstsammlungen instituted this action when it first moved to intervene. 2B Moore, Federal Practice § 24.12[1], p. 503 n.7. Elicofon asserts that the Kunstsammlungen's claim is barred by the three-year statute of limitations contained in N.Y.C.P. L.R. § 214(3).

This court already decided the statute of limitations issue in favor of the Kunstsammlungen in our Memorandum of Decision and Order dated February 24, 1975. In that decision, we vacated our prior decision of September 25, 1972 and allowed the Kunstsammlungen to intervene because the United States extended recognition to the German Democratic Republic in September 1974. In so doing we rejected Elicofon's objection to intervention which was based on the statute of limitations and found that the statute of limitations was tolled from October 7, 1949 to September 4, 1974 when the German Democratic Republic was not recognized by our government because "[t]he period of the statute does not commence until a forum is available in which a party may enforce its cause of action." Our prior ruling may be viewed as the law of the case regarding the statute of limitations issue. Nevertheless, we may exercise our discretion to redetermine the statute of limitations issue especially where, as here, the issue is one of a substantial nature and the prior determination was made on a motion to intervene. *See* 1B J. Moore, Federal Practice § 404[4], p. 451–52.

Elicofon presents no new facts that persuade us that the exception to the tolling rule spelled out in *Guaranty Trust Co. of New York v. United States,* 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938), is applicable. Therefore, we turn to the alternative arguments of the parties presented for the first time on this motion.

Elicofon now argues that even without regard to the tolling of the statute from October 7, 1949 to 1974, the period of non-recognition of the German Democratic Republic, the claim by the Kunstsammlungen is time-barred because the statute of limitations began to run in 1946 when Elicofon purchased the paintings and was not tolled by any subsequent disability. It is argued that in 1946 and through at least September 1, 1949 the Allied Powers, acting through the Allied Control Council, were recognized by the United States as the government for Germany and were qualified to sue on behalf of the owner of the Duerers.

Assuming that the cause of action accrued in 1946, and that the Allied Powers could have instituted suit we would find, nevertheless, that the action, commenced in 1969, was not time-barred. The statute of limitations that would have governed this action had it accrued in 1946 would have been at least six years.[18] Thus, the period would not have expired by 1949 when the non-recognition toll came into existence.

■ We reject Elicofon's argument that once the statute began to run in 1946, it was not tolled by the after-arising disability. New York's general after-arising disability rule which in 1949 was embodied in Section 28 of the Civil Practice Act applied only to disabilities enumerated in the same title of the Act. Since the non-recognition toll is not statutory but was judicially created the after-arising disability rule is inapplicable. *Nathan v. Equitable Trust Co.,* 250 N.Y. 250, 165 N.E. 282 (1929). Judicially created common law disabilities have repeatedly been held to toll the statute of limitations in spite of the fact that the disability arose after the cause of action accrued. *E.g., Hanger v. Abbott,* 73 U.S. (6 Wall) 532, 18 L.Ed. 939 (1868); *Osbourne v. United States,* 164 F.2d 767 (2d Cir. 1947).

No authority supports Elicofon's claim that the four Allied Powers could have brought suit in the United States on behalf of Germany during the period from the asserted accrual of the cause of action in 1946 until 1949. Even if we were to find that the Allies were authorized as a government of Germany to bring such a suit, the prosecution of such a suit from 1946 to 1949 would not have been permitted because "war suspends the right of enemy plaintiffs to prosecute actions in our courts." *Ex Parte Colonna,* 314 U.S. 510, 511, 62 S.Ct. 373, 373–74, 86 L.Ed. 379 (1942). "Enemy"

---

18. We need not decide whether the applicable statute of limitations was that contained in Section 53 of the Civil Practice Act for equity actions, *i.e.,* ten years, or that contained in Section 49(4) of the Civil Practice Act for an action at law to recover a chattel, *i.e.,* six years, since neither period would have expired by 1949.

includes "the government of any nation with which the United States is at war. Trading with the Enemy Act of 1917, 50 U.S.C.App. § 2(b); *Ex Parte Colonna, supra.* The state of war was not officially terminated until October 19, 1951, by Presidential Proclamation No. 2950, Oct. 27, 1951, 16 Fed.Reg. 10915 (1951) pursuant to H.R.J.Res. 289, 82nd Cong., 1st Sess., 65 Stat. 451 (1951). This disability would have tolled the running of the statute of limitations in New York by virtue of an express statutory provision contained in Section 27 of the Civil Practice Act.

■ We also reject Elicofon's assertion that the cause of action accrued in 1946 when Elicofon purchased the paintings. Rather, it accrued in October 1966, when Elicofon refused, upon demand, to return the paintings. Thus, when the Kunstsammlungen instituted suit in April 1969, it was within three years of accrual of the cause of action and timely under N.Y.Civ.Prac.Law § 214(3).

Under New York law, in an action to recover converted property from a bona fide purchaser an owner must prove that the purchaser refused, upon demand, to return the property. *Gillet v. Roberts,* 57 N.Y. 28 (1874). If the demand required is merely procedural in nature, N.Y.C.P.L.R. § 206(a) applies, which provides that the cause of action accrues at "the time the right to make the demand is complete," in this case, in 1946, when Elicofon purchased the paintings. If the demand is of a substantive nature, the statute of limitations runs only after a demand has been made and refused, in this case, October 1966. *Frigi-Griffin, Inc. v. Leeds,* 52 A.D.2d 805, 383 N.Y.S.2d 339 (1st Dep't. 1976). A substantive demand is one which is "a part of the cause of action," *Dickinson v. Mayor of New York,* 92 N.Y. 584 (1883), while a procedural demand is one which is a "condition of maintaining the action and not an essential part of it." *Id.* at 590.

In *Menzel v. List,* 22 A.D.2d 647, 253 N.Y.S.2d 43, 44 (1st Dep't. 1964), *on remand,* 49 Misc.2d 300, 267 N.Y.S.2d 804 (Sup.Ct.N.Y.Co.1966), *modified on other grounds,* 28 A.D. 516, 279 N.Y.S.2d 608 (1st Dep't. 1967), *modification rev'd,* 24 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969), it was held that "a demand by the rightful owner is a substantive, rather than a procedural, prerequisite to the bringing of an action for conversion by the owner." Accordingly, the court in *Menzel* found that "the statute of limitations did not begin to run until demand and refusal." *Id.* at 647, 253 N.Y.S.2d at 44. *Accord, Duryea v. Andrews,* 34 N.Y.Sup.Ct. 774, 12 N.Y.S. 42 (2d Dep't. 1890).

The legal principle underlying the rule that the demand and refusal are substantive elements of the cause of action against the bona fide purchaser is that the bona fide purchaser's possession is initially lawful, and only becomes unlawful once he has refused, upon demand, to return the property to the true owner. *Tompkins v. Fonda Glove Lining Co.,* 188 N.Y. 261, 80 N.E. 933 (1907); *Cohen v. Keizer, Inc.,* 246 A.D. 277, 285 N.Y.S. 488 (1st Dep't. 1936). Possession by a bona fide purchaser "is not in itself a sufficiently serious interference with the owner's rights to amount to conversion." Prosser, Law of Torts 84 (4th ed.);[19] The legal principle has a practical purpose as stated in *Gillet v. Roberts,* 57 N.Y. 28, 34 (1874):

> The rule is a reasonable and just one, that an innocent purchaser of personal property from a wrongdoer shall first be informed of the defect in his title and have an opportunity to deliver the property to the true owner before he shall be made liable as a tort feasor for wrongful conversion.

It is not this court's function to improve upon, but only to follow New York law.

---

**19.** Prosser notes that New York's courts take the minority view. *Accord,* Comment L to § 229 of the Second Restatement of Torts.

A demand and refusal are not necessary if the bona fide purchaser has sufficiently interfered with the owner's right in some other way so as to constitute a conversion, for instance, where he sells the property, *Pease v. Smith,* 61 N.Y. 477 (1875), or where he continues to possess the property as his own after learning that it was stolen, *Employer's Fire Ins. v. Cotten,* 245 N.Y. 102, 156 N.E. 629 (1927).

Therefore, like the court in *Menzel* we find that the statute of limitations begins to run from demand and refusal.

Elicofon points to the unfairness of a rule where the statute of limitations runs from demand upon a bona fide purchaser, which could indefinitely postpone commencement of the action, while the thief would have long since gained immunity from suit. We disagree. First, a thief who conceals his possession and thereby makes it impossible for the owner to institute suit within the limitations period may be estopped from asserting the statute of limitations as a defense. *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966). Second, as discussed below, a demand cannot be indefinitely postponed by plaintiff because there is a requirement that it be made within a reasonable time. *Heide v. Glidden Buick Corp.*, 188 Misc. 198, 67 N.Y.S.2d 905 (S.Ct.App.T. 1st Dep't. 1947).

The rulings and reasoning in the cases cited by Elicofon, *Federal Insurance Co. v. Fries*, 78 Misc.2d 805, 355 N.Y.S.2d 741 (N.Y.Civ.Ct., N.Y.Co.1974), and *Stroganoff-Scherbatoff v. Weldon*, 420 F.Supp. 18 (S.D. N.Y.1976), do not alter our view that the rule applied in *Menzel* is the existing New York rule. In *Fries*, Judge Younger did not discuss the significance of the distinction between a substantive and procedural demand and appeared to simply literally apply the provisions of § 206(a). In *Stroganoff*, Judge Bonsal noted *in dictum* only that "it would appear" that the action commenced when the right to make the demand was complete, 420 F.Supp. at 21 n.5. As in *Fries*, the court in *Stroganoff* did not discuss the distinction between substantive and procedural demands.

b. *Reasonableness of the Delay in Commencing Suit*

◼ As stated previously, under the law of New York a party may not unreasonably delay in making a demand which starts the running of the limitations period. *Heide v. Glidden Buick Corp.*, 188 Misc. 198, 67 N.Y. S.2d 905 (S.Ct.App.T. 1st Dep't. 1947). Elicofon claims that the Kunstsammlungen's

delay in making the demand upon Elicofon was unreasonable and, therefore, the Kunstsammlungen should be precluded from prosecuting this action. In the alternative, Elicofon claims that there is at least a question of fact as to whether the delay was unreasonable which precludes our granting summary judgment to the Kunstsammlungen. *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974).

◼ The question of what constitutes a reasonable time to make a demand depends upon the circumstances of the case. *Reid v. Board of Supervisors*, 128 N.Y. 364, 28 N.E. 367 (1891); *Nyhus v. Travel Management Corp.*, 466 F.2d 440 (D.C.Cir.1972). It is quite clear that the Kunstsammlungen could not have made a demand until the whereabouts of the Duerers became apparent. *Schmid v. Dohan*, 167 F. 804 (2d Cir. 1909). Elicofon claims, however, that it was the duty of the Kunstsammlungen to make genuine and diligent efforts to find the paintings and because the Kunstsammlungen failed or at least there is a question of fact as to whether the Kunstsammlungen failed to make such efforts any delay in making a demand for the paintings was unreasonable or at least presents a question of fact as to reasonableness. The Kunstsammlungen refutes Elicofon's assertion that it had the duty to diligently look for the paintings and suggests that its only duty was to make the demand once it knew of the location of the paintings. In support of its view the Kunstsammlungen cites the case of *O'Keeffe v. Snyder*, 170 N.J.Super. 75, 405 A.2d 840 (App.Div.1979), *rev'd and remanded*, 83 N.J. 478 (1980), where the court, holding that the statute of limitations did not begin to run until plaintiff discovered the facts which made it possible to institute suit, found that this was so despite plaintiff's failure to publicize the theft in an effort to locate the paintings. The Supreme Court of New Jersey, however, reversed on this issue. We need not decide this issue because the undisputed evidence clearly demonstrates that the

Kunstsammlungen made a diligent although fruitless effort to locate the paintings. There was no unreasonable delay in making demand.

As previously discussed, Dr. Scheidig first reported that the Duerers were missing in his report of July 19, 1945 to the Land Office of Education (Scheidig Dep. Exh. 19). In a letter to Dr. Scheidig of September 28, 1945, Dr. Zimmerman of the Kaiser Freidrich Museum in Berlin, whom Dr. Scheidig had informed of the looting at Schwarzburg, asked for detailed information about the thefts so that he may inform the U. S. Military authorities. (Scheidig Dep. Exh. 21). On October 3, 1945 Dr. Scheidig supplied Dr. Zimmerman with a list of the missing works and on October 12, upon a further request, Dr. Scheidig informed Dr. Zimmerman of the Army unit which was stationed at Schwarzburg. (Scheidig Dep. Exhs. 22, 23, 24, 49). Dr. Zimmerman told Dr. Scheidig that he would forward this information to the American Military authorities. On March 22, 1946, Dr. Scheidig wrote to Dr. Mueller of the Bavarian National Museum asking whether he had had any word of the Duerers or any of the other stolen works. (Scheidig Dep. Exh. 28). In May 1947, Dr. Scheidig asked the Office of the President of the Land of Thuringia again to call the matter to the attention of the Allied Control Council. (Scheidig Dep. Exh. 29). In September 1948, Dr. Scheidig sent a report about the theft to the Soviet Military Administration (Scheidig Dep. Exh. 30).

During the late forties, Dr. Scheidig testified, he solicited the aid of Dr. Koehler, then a professor at Harvard University and formerly the Director of the Staatliche, and of Charles K. Kuhn, curator of the Germanic Museum at Harvard, both of whom were in contact with Ms. Ardelia Hall, the State Department officer who supervised the American restoration program. The Kunstsammlungen does not, however, submit evidence of this correspondence; but in a 1961 letter from Dr. Kuhn to Ms. Hall of the U. S. State Department, Dr. Kuhn referred to "a desultory correspondence" he had been conducting with Dr. Scheidig; and in a 1953 letter to Ms. Hall, Dr. Scheidig spoke of his correspondence with Drs. Koehler and Kuhn. It was through Dr. Kuhn that Scheidig came into contact with Ms. Hall.

On October 21, 1953 Dr. Scheidig wrote to Ms. Ardelia Hall of the State Department (Sabel Aff. Exh. 9) to thank her for her letter to him of October 14, 1953 in which she informed him that gold coins had been recovered. In this letter he also inquired about other losses from the museum, "[p]articularly the two portraits by Albrecht Duerer," and asked if she would contact Drs. Koehler and Kuhn regarding the missing works, describing them as colleagues with whom he had been in touch before acquiring Ms. Hall's address. He enclosed a memorandum describing the works of art. At her request, the Army conducted an investigation in 1954, interviewing officers and servicemen who served at Schwarzburg (Safel Afft. Exh. 3). Correspondence between Dr. Scheidig and Ms. Hall continued into the 1960's. (Sabel Afft. Exhs. 2, 10; Scheidig Dep. Exh. 33; Rand Afft. Exh. B).

In 1956, the State Department transmitted information about the lost paintings, including the Duerers, to the Federal Republic of Germany Trust Administration, which had assumed administration of the restoration program instituted by the Allied Forces. (Rand Afft. Exh. c). On July 31, 1961, Secretary of State Dean Rusk wrote the American Embassy in Bonn regarding the paintings, and specifically alluded to Duerer's Tucher portraits. (Sabel Afft. Exh. 7). He stated that the loss had been reported to Dr. Zimmerman in 1945 for forwarding to Inter-Allied Commission, and subsequently to all other authorities and that an extensive Army investigation produced no further information. He suggested that the enclosed information about the German architect Fassbender and a list of the missing paintings be brought to the attention of West German officials in an effort to locate Fassbender, who he stated, may have been responsible for the thefts.

In 1957, the loss of the Duerers and other paintings was discussed in the East German

publication, Kunstmuseen der Deutschen Demokratischen Republik ("Art Museums of the German Democratic Republic") 77–78 (1957) (Scheidig Dep. Exh. 35), and in *Verlorene Werk der Malerei* ("Lost Paintings") 175–79 (1964–65) which was published jointly in East and West Germany (Scheidig Dep. Exh. 48). Mr. Stern, who in 1966 identified the Duerers as those hanging on Elicofon's wall recognized them in this publication.

The United States conducted its own independent program to recover art work stolen during World War II. In 1945, the American Commission for the Production and Salvage of Artistic and Historic Monuments in War Areas circulated a letter among universities, museums, libraries and art dealers requesting vigilance in identifying such objects and notification of the Secretary of State. In 1950, the Department of State circulated another such letter which was also reprinted in the American Federation of Arts' *Magazine of Art* (1951) and the College Art Association of America's *College Art Journal* (1950). Hall, The Recovery of Cultural Objects Dispersed During World War II, Department of State Bulletin, vol. XXV, No. 635 (August 27, 1951).

We turn now to the deficiencies in the Kunstsammlungen's search for the paintings asserted by Elicofon. In July 1946, the United States, the United Kingdom and France entered into an agreement for the control of missing works of art. In accordance therewith, the United States Military authorities established four Central Collecting Points ("CCP") in Munich, Offenbach, Marburg and Wiesbaden, where works of art turned in to the American occupation forces were catalogued and stored until claimed by their rightful owners. In 1949 the U. S. Military Government turned over the contents of the Munich CCP to a Trust Administration of the Federal Republic of Germany. The plan proved to be a very successful method of restoring stolen artwork. According to Elicofon, the theft of the Duerers was never made known at any of the Collecting Points. On the basis of an assertion by Dr. Rike Wankmuller, the cur-

rent head of the West German successor to the Munich Collecting Point that "a prudent person diligently seeking to obtain or disseminate information about paintings which had been stolen in the course of the American military occupation would have made use of the CCP Munich" (Wankmuller Afft. p.3), Elicofon asserts that the Kunstsammlungen's effort, therefore, could not have been diligent.

First, we note that it is not clear whether any of the CCPs were at one time or another informed of the loss of the Duerers and other art work located at Schwarzburg. Elicofon's claim that they were not is based only on the lack of any document indicating that a request was made, and two statements of Dr. Wankmuller made in the 1970's that no one had ever inquired about the Duerers. We note that Dr. Wankmuller's statement is wrong since, as noted previously, a 1956 State Department memo from Ms. Hall did, in fact, inform the Trust Administration of the theft, contrary to Dr. Wankmuller's assertion. (Rand Afft. Exh. C). Elicofon also notes that in a letter of February 28, 1948, Dr. Mueller of the Bavarian National Museum in Munich, to whom Dr. Scheidig related information about the thefts for forwarding to the U. S. authorities, advised the Munich CCP on behalf of the Weimar, of the loss of a Duerer drawing and a Cranach oil painting stolen from Schwarzburg. As noted above, Dr. Scheidig had written to Dr. Mueller in March 1946 inquiring about the Duerer drawing and Cranach oil which the Thuringian president had given as a gift to Hitler and also listing the Duerer portraits as among the stolen paintings. The fact that two years later, in a letter written by Dr. Mueller to the Munich CCP he inquired about the Duerer drawing and the Cranach and didn't mention the Duerer portraits is no indication that he didn't inform the CCP of the Duerers, either orally or by previous or subsequent letter.

If the CCP was never informed of the Duerers, in light of the many other efforts made to locate them, such a failure to inform cannot be attributed to a lack of dili-

gence. Rising political tensions and a deliberate lack of cooperation between the Western Allies and the Soviets may have been responsible. The Soviets were not party to the Agreement which formed the basis for the restoration effort. Documents submitted (Sabel Afft. Exhs. 14–16) disclose that in 1948, the Soviet Government declined an invitation to join the Agreement entered into among the U. S., England and France in 1946, because it "was concluded a year and a half ... [before] without the knowledge of the Soviet Government and ... affords special rights to the United States ... and Great Britain in comparison with the countries whose territory was occupied by the enemy." Indeed, as the Kunstsammlungen notes, the 1946 Agreement by its terms dealt only with "cultural property looted by the enemy in countries formerly occupied," for instance, England and France, and not property belonging to Germany.

In examining, generally, the efforts made to find the paintings, the hostility and tension existing between the Western Allies and the Soviets must be considered. The tension culminated in the withdrawal in 1948 of the Soviets from the Allied Control Council. Thus, the Soviets refused to honor claims of the Western Allies, and they responded in kind. It is understandable then that Dr. Scheidig's efforts at communications with responsible authorities in 1946 were through and dependent upon the efforts of a colleague in Munich, and former colleagues in the United States. It was also reasonable under the circumstances to attempt to relay information through colleagues in the United States who could in turn relay them to United States authorities whose efforts were not frustrated by the tensions existing in Europe. In addition, communication in Germany after the war was difficult at best. Rules regulated

everyday conduct; travel from zone to zone was unlawful without permits which were difficult to obtain.

Efforts to locate the paintings, initiated by Dr. Scheidig, followed many channels, a few of which we have been informed of. In view of insurmountable impediments the activities reflect a continuous and diligent search. There exists no question that the efforts to find the paintings were "reasonably diligent". Therefore, the delay in making the demand for their return was reasonable and excusable as a matter of law.[20]

We find that the statute of limitations does not present any fact issues and is insufficient as a matter of law.

3. *The Kunstsammlungen's Right to Pursue This Action to Recover the Paintings*

a. *The Kunstsammlungen's Ownership of the Paintings*

■ To recover possession of the Duerer paintings the plaintiff must prove ownership. *Honeywell Information Systems, Inc. v. Demographic Systems, Inc.*, 396 F.Supp. 273, 275 (S.D.N.Y.1975). Elicofon contends that the Kunstsammlungen does not own the Duerers and, therefore, is not entitled to their possession. In our Memorandum of Decision and Order dated August 24, 1978, we found that at least as of 1927 the paintings were owned by the Land of Thuringia, title having been transferred from the Grand Duke, as acknowledged in the Settlement Agreement of 1927 between the Land of Thuringia and the widow of Wilhelm Ernst. Thus, it is from 1927 forward that we need trace the ownership of the Duerers.[21]

---

**20.** Our discussion of the reasonableness of the delay in making the demand for the paintings also disposes of Elicofon's assertion of the defense of laches, asserted in his answer as the Fifth Affirmative Defense.

**21.** On the issue of succession of ownership of the Duerers, the Kunstsammlungen submits the following affidavits of experts:

| | | |
|---|---|---|
| Bernard Graefrath | 4/80 | §§ 4–29 |
| Martin Posch | 4/80 | § 6(b) |
| Manfred Hofmann | 9/80 | pp. 5–8. |

Elicofon submits the following affidavits of experts:

The Kunstsammlungen claims that it acquired ownership of and right to possession of the Duerers as the legal successor to the pre-war Land of Thuringia. It traces succession in the following manner:

The Land of Thuringia, the owner of the paintings in 1927, remained the owner throughout the Third Reich period (1933–1945), operating through its instrumentality, the Staatliche Kunstsammlungen zu Weimar, the predecessor of the Kunstsammlungen zu Weimar. When Hitler surrendered on May 7, 1945, the Allied Forces assumed supreme authority over the national and local affairs of Germany. During the period of occupation by the Allied Military Forces, ownership of the Land's properties and the administration of its affairs remained vested in the Land Government subject to military orders.

In 1949, the German Democratic Republic was established as a sovereign state and the Land of Thuringia became one of its political subdivisions. On October 1, 1950, a directive of the Ministries of Interior and Finance of the German Democratic Republic declared that the physical assets of the Lands were comprised of properties transferred from the former Lands or by specific provisions of law. By law of July 25, 1952 of the German Democratic Republic, the Lands were directed to effect a reorganization of the political structure by establishing new political organs, "BeZirke". On October 14, 1952, the Ministry of Finance directed that the administration of property of each of the Lands was to be deemed transferred to the newly created organs. Under this scheme, administration of the Museum of Weimar and its art collections

was transferred to the newly created Stadtkreis Weimar. It is the interest in the paintings of the Stadtkreis Weimar and, consequently, the German Democratic Republic which the Kunstsammlungen represents in this action.

Elicofon challenges the Kunstsammlungen's claim to title on the following grounds: First, it is argued that property owned by the various pre-Reich Lands was transformed into Reich property by legislation adopted by the Third Reich in 1934; the German Democractic Republic does not claim to be the successor to the Third Reich.

The 1934 Reich legislation on which Elicofon relies, called the "Law for the Reconstruction of the Reich" provided in pertinent part that "sovereign rights of the Laender are transferred to the Reich." The law had the purpose and effect of finally abolishing the pre-Nazi republic and federal forms of government in favor of a centralized totalitarian Reich. Thus, although the 1934 law did not formally abolish the individual Lands, their role as administrators of separate States ended, and they became merely administrators of Reich leadership. The Federal Republic of Germany has asserted its right to all the assets and property of the Third Reich, proclaiming its identity with and its continuance of the Reich in the Preamble to its Constitution.[22] Elicofon suggests that title to the paintings is, therefore, in the Federal Republic of Germany. In contrast, it is argued, the German Democratic Republic has not generally taken the position that it is the successor to the Reich. East Germany's position that it is not a successor to the Reich is, it is argued, manifest in the fact that it has declined to

| Wolfgang Seiffert | 1/80 | §§ 9–16 |
| Wolfgang Seiffert | 6/80 | §§ 11–23 |
| Ernest C. Steifel | 1/80 | §§ 20–22 |

22. Although the Federal Republic of Germany may regard itself as identical to the Reich government, notable international law theorists disagree and regard the Federal Republic rather as a legal successor to the Reich, reasoning as follows: Once a state becomes extinct under the international law, there can be no identity. In the case of Germany

the Occupying Powers took over the supremacy over all federal, state and local organs, so that *all* organs depended on them. *All* law in occupied Germany in 1945 after the unconditional surrender had its only reason of validity in the supremacy of the Occupying Powers. Even in 1954 there was still no sovereign Germany.... Under these conditions it seems impossible not to recognize that it 'is clearly not identical with the Former German Reich. It is a new state ... a successor state to the German Reich.' " Kunz, *Identity of States Under International Law*, 49 Am.J. Int'l Law 68, 71 (1955), *quoting* Plischke, in Political Science Quarterly, Vol. 69 p. 262 (June, 1954).

accept responsibility for obligations and liabilities of the Reich.

Assuming that the paintings did not become Reich property, Elicofon's second reason for challenging the Kunstsammlungen's theory is that the newly formed Land of Thuringia in the German Democratic Republic is not, under East German theory, a successor to the pre-war Land. This was the reasoning underlying 1951 and 1952 decisions of the Supreme Court of the German Democratic Republic in which it rejected liability of the German Democratic Republic for an incumbrance on real property located in the German Democratic Republic which had been incurred by another pre-war Land within its territory. The Court reasoned that the answer turned on whether the new Lands were identical with the former German Reich and its territorial subdivisions or, if not, whether they are to be regarded as legal successors to their former territorial counterparts. Rejecting liability, the court reasoned that the encumbered property had been sequestered by Soviet Military Order No. 124 and by virtue of the subsequent Soviet Order No. 154/81, possession and the right of disposition were transferred to the post-war *Land*. Accordingly, the court found, the Land thereby acquired original ownership and this original acquisition led to extinction of the *in rem* encumbrance. *Neue Justiz*, p. 222 (October 31, 1951); *Neue Justiz*, p. 552. (September 18, 1952). Thus, it is argued by Elicofon, under East German theory, the war and the Soviet Military Occupation represent a decisive break, and the public institutions of the German Democratic Republic trace title to their property only through Soviet occupation; since the Duerer paintings had already been removed from Thuringia when

Soviet Order No. 124 went into effect in October, 1945, they were not subject to that or to the subsequent Order No. 154/18 which ended sequestration and transferred title to the new Land; consequently, the new Land of Thuringia never acquired title to them.[23]

The Kunstsammlungen contends that the 1934 law only stripped the Lands of political sovereignty but did not deal at all with property rights, which remained vested in the Lands. It is argued that while the rulers of the Third Reich envisaged the ultimate total displacement of the federal structure with a unitary state, the 1934 law was only the beginning of the program; and by May 8, 1945 when the Reich Government ceased to exist, the planned transfer of property interest had not yet taken place.

Moreover, the Kunstsammlungen argues, it is irrelevant whether title to the Duerers passed to the Reich by virtue of the 1934 law or remained vested in the Land of Thuringia for, contrary to what Elicofon contends, the German Democratic Republic does consider itself a successor to the Reich, and to the Land of Thuringia. The Kunstsammlungen submits a declaration issued in 1956 by the government of the German Democratic Republic enunciating what has been denominated the "dual-state" theory under which Germany is regarded as having been succeeded by two states, neither of them identical to the former Reich. *See* 5 Dokumente zur Aussenpolitik der Deutschen Demockraticschen Republik, 26 *et seq.* (Berlin 1958). *See also* Geck, *Germany and Contemporary International Law*, 9 Tex. Int'l L.J. 263, 266 (1974). In addition,

**23.** In further support of the theory that it is the position of the German Democratic Republic that the post-war Land of Thuringia acquired rights in property of the pre-war Land only by virtue of the Soviet sequestration and subsequent transfer of the property, Elicofon refers us to the charter of the Dresden Museum published on March 27, 1957 and the "Directive Concerning the Statute for the State Museum at Berlin" dated January 25, 1952. Similar language is contained in both charters. The relevant portion of the Dresden charter reads:

The re-creation of the State Art Collections Dresden in the German Democratic Republic ... was made possible by the generous act of friendship of the Government of the Soviet Union in transferring to the Government of the German Democratic Republic and thereby into the hands of the entire German people the treasures of the Dresden Art Gallery which were saved by the Soviet Army from destruction by Fascism.

the Supreme Court of the German Democratic Republic has issued an advisory opinion dated August 20, 1980 in which it stated that as one of the existing states on the territory of the former Reich, the German Democratic Republic is the legal successor of the Reich within its territorial jurisdiction; that although the post-war Lands and other political subdivisions in East Germany are not identical to the pre-war Lands and subdivisions of the Reich, they are their legal successors. The court also noted that the position advanced in its 1951 and 1952 decisions (cited by Elicofon) that property of the pre-war Lands had not passed to the post-war Lands by legal succession but through transfer of ownership by the Soviet Union, had long since been abandoned by the Court.

On the basis of the East German authority cited we agree that it is the position of the German Democratic Republic that it is the successor to the Reich within its territorial jurisdiction. However, we note that although the view of the chiefs of state of the country concerned weigh very heavily in determining whether a new state is the legal successor to a predecessor state, cf. *Ivancevic v. Artukovic*, 211 F.2d 565, 573–74 (9th Cir.), *cert. denied*, 348 U.S. 818, 75 S.Ct. 28, 99 L.Ed. 645 (1954), principles of international law govern the question of legal succession. The view of the German Democratic Republic that it is a successor to the Reich comports with principles of international law. To the extent that rights in property belonging to the former territory are concerned succession takes place as a matter of international law once the new state, here the German Democratic Republic, is recognized as the sovereign of the territory. Thus as to property rights, a succession took place without regard to the genesis of the rights—whether the Reich or the Land of Thuringia.

It is generally agreed that "[a] succession of International Persons occurs when one or more International Persons take the place of another International Person, in consequence of certain changes in the latter's condition." 1 Oppenheim, International Law 157 (Lauterpacht, 8th ed.). Succession

of states, which takes place when the former state becomes extinct and is replaced by a new state is to be distinguished from continuation of a state which has undergone some change in its legal order, government, territory or population but to such an insignificant extent that it is determined to be identical with the former state. In the latter case, the state in its new form is not considered a new state but a continuation of the old; thus, although problems involving principles of state succession may arise to determine the effect of the change in form on the state's international and local rights and obligations, generally it is said to maintain its prior legal status in all respects. 2 Whiteman, Digest of International Law 754. Thus, Elicofon incorrectly relies on the Preamble to the West German Constitution wherein it is stated that the West German Government considers itself identical to and a continuation of the former Reich, to suggest the exclusion of East Germany as a successor to the Reich within its territory. The German Democratic Republic, while disclaiming any identity with the Reich, has established itself as an International Person in connection with its territory and thereby has become a successor to the German Reich.

We turn now to the question of whether the East German status as a successor confers on it the right to recover the Duerer paintings. The devolution of rights and duties upon a successor state takes place "through the very fact of one International Person following another in the possession of State territory." 1 Oppenheim, International Law 158 (Lauterpacht, 8th ed.). When a state ceases to exist and becomes two or more states, there is no doubt that property located in the territory of the successor which was designated for local use by the predecessor is acquired by the successor. O'Connell, The Law of State Succession 227–28 (1956); 1 Oppenheim, International Law 165, 166 (Lauterpacht, 8th ed.); Report of the International Law Commission, etc., General Assembly Official Records: Thirty Fourth Sess., Supp. No. (A-34-10) Art. 14 (1979). "The same principles apply to incor-

poreal as to corporeal property.... This is not because of any transmission of the legal relationship from the old to the new state, but merely because the capital of a public investment constitutes 'property' which pertains to the sovereign authority and can be recovered by it .... It can enforce all claims of its predecessor which relate to public assets in the absorbed territory, or to money advanced from local treasury funds." O'Connell, The Law of State Succession 229–31 (1956); *Land Oberoesterreich v. Gude*, 109 F.2d 635, 637 (2d Cir. 1940).

A corollary to the doctrine of acquired rights of a successor state is the doctrine of unjustified enrichment. In the context of this case, the doctrine dictates that when a state is divided up among two or more states, each successor state assumes responsibilities for its portion of the financial obligations of the predecessor. 1 Oppenheim, International Law 164–65; (Lauterpacht, 8th ed.); O'Connell, The Law of State Succession 156–57 (1956); *see The Sapphire*, 78 U.S. (11 Wall.) 164, 20 L.Ed. 127 (1871); Report of the International Law Commission, etc., General Assembly, Official Records: Thirty Fourth Sess., Supp. No. (A/34/10) Arts. 22, 23 (1979). We reject Elicofon's claim that the German Democratic Republic should not be accorded the privileges of succession by being permitted to seek return of the paintings because it has refused to recognize its obligation as successor to the Reich in its territory, and through decisions of its courts has refused to honor claims similar to the one it asserts here for misappropriated property now located in its museums. Even if the German Democratic Republic has improperly refused to recognize obligations of its predecessor, this fact would not serve to defeat its claim against Elicofon. Elicofon does not claim that the German Democratic Republic has repudiated an obligation owing to Elicofon. If such were the case, we would permit Elicofon to assert his rights by way of counterclaim, and thereby enforce the German Democratic Republic's obligations as a successor. *See, e.g., State of Russia v. Bankers' Trust Co.*, 4 F.Supp. 417 (S.D.N.Y.1933), aff'd, 83 F.2d 236 (2d Cir. 1936); *Agency of Canadian Car & Foundry Co. v. American Can Co.*, 253 F. 152 (S.D.N.Y.1918), aff'd, 258 F. 363 (2d Cir. 1919). Therefore, while it is true that no successor state "can refuse responsibility for the acts of its predecessor without raising the issue whether such a state still belongs to the society of states linked by the principles of international law," 1 Schwartzberger, International Law 70 (1945), a determination in that regard is one of national policy. In recognizing the German Democratic Republic, one of the rights accorded to that government by the United States was the right to bring suit in our courts. To preclude the German Democratic Republic from maintaining this suit on the ground that its courts have not enforced its international obligations as a successor state, would be to effectively reformulate our national policy. Our judicial power extends only to enforcement in our courts of what we perceive to be the international obligations of the successor state when the interest of the parties in their enforcement is immediate.[24]

---

**24.** Our discussion of this issue also disposes of Elicofon's Sixth and Seventh affirmative defenses which, although not pressed in his motion for summary judgment, appear in his answer.

As his Sixth affirmative defense Elicofon asserts that by virtue of Law No. 47 of the Allied High Commission dated February 14, 1951, as amended, and the Convention on the Settlement of Matters Arising Out of the War and the Occupation, signed at Bonn, Germany, on May 26, 1952, as amended by Schedule IV to the Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, signed at Paris on October 23, 1954, the Kunstsammlungen zu Weimar may not maintain this action.

As a Seventh affirmative defense Elicofon asserts that the Kunstsammlungen zu Weimar should be barred from maintaining this action until such time as the German Democratic Republic of which it is an agency and instrumentality, agrees to recognize claims arising out of the criminal acts perpetrated by the government of Nazi Germany.

Our discussion of the principles of international law and our national policy which govern the Kunstsammlungen's right to pursue this action precludes our considering the Sixth and Seventh affirmative defenses as barring plaintiff's action.

For the reasons stated above, we find that the German Democratic Republic through the Kunstsammlungen has the right to immediate possession of the Duerer paintings and, therefore, the right to maintain this suit.

b. *Kunstsammlungen's Legal Capacity to Pursue this Action*

In agreement with the local state organ, the Minister of Culture of the German Democratic Republic issued on April 14, 1969 an order conferring juristic status on the Kunstsammlungen zu Weimar to take effect retroactively as of January 1, 1969. On April 14, 1969 the Kunstsammlungen moved to intervene in this action which had been commenced by the Federal Republic of Germany in January, 1969. Permission to intervene was granted on February 25, 1975. Elicofon asserts that the order of April 14, 1969 conferring juristic status on the Kunstsammlungen did not give the Kunstsammlungen the right to prosecute this claim for two reasons: First, the order conferring juristic personality retroactively was ineffective under East German law; second, even if the order of April 14 effectively conferred juristic status, the Kunstsammlungen, as a mere administrator of public property, cannot enforce the rights of the state in the paintings. Such a deficiency under the laws of its domicile would bar its right here. *Carl Zeiss Stiftung v. Veb Zeiss Jena*, 433 F.2d 686, 698–99 (2d Cir. 1970).[25] We reject both bases for the challenge to the Kunstsammlungen's capacity.

Under the law of the German Democratic Republic, a legal action may not be brought by one who does not have legal capacity ("Rechtsfahigkeit"). A state organization or institution can be granted legal capacity by state authorities; such status was conferred upon the Kunstsammlungen on April 14, 1969. With the establishment of the

juristic person, the Kunstsammlungen zu Weimar, all rights and obligations connected with the care, custody and exhibition of the collection were transferred to that body. As a result, the Kunstsammlungen became the sole organization which possesses the capacity to appear in civil proceedings in connection with claims to the assets of the museum.

The conferral of juristic status on April 14, 1969 retroactive to January 1, 1969 was valid under German law. In the face of Elicofon's claim that such granting retroactive effect is "unique" in the legal practice of the German Democratic Republic, the Kunstsammlungen submits six other orders of the German authorities in which legal capacity was conferred retroactively. Elicofon offers no grounds to question the validity of these orders and, accordingly we consider them reliable authority to support the validity of the April 14 order. Even in the absence of such authority we can discern no policy or legal principle of the German Democratic Republic which would be undermined by the retroactivity. Elicofon asserts that granting retroactive effect to an order conferring juristic status violates the fundamental principle that the creation of a juristic person and a designation of the extent of its legal and commercial capacity are identical. This is because a juristic person cannot exist without a designated function or capacity. The designation is contained in its "statut" which is promulgated only upon the conferral of juristic status. However, we perceive no reason that the designation of the function of the juristic person shouldn't also be deemed to have retroactive effect.

We also reject Elicofon's claim that the conferral of juristic personality was ineffective because the statutory articles, "statut", of the Kunstsammlungen zu Weimar that were envisioned by the order of

**25.** On this issue Elicofon submits the following affidavits:

Wolfgang Seiffert 1/80 §§ 24–27
Wolfgang Seiffert 1/80 § 17

In support of its position on the issue of capacity to sue the Kunstsammlungen submits the following affidavits:

Bernard Graefrath 4/80 §§ 30–31
Martin Posch 4/80 §§ 13–14
Martin Posch 9/80
Manfred Hofmann 9/80 pp. 4–5

April 14, 1969 were not adopted until April 16, 1969, after the Kunstsammlungen moved to intervene. Elicofon argues that since the extent of a juristic entity's legal capacity is determined by the designation of its function in its "statut" at the time the Kunstsammlungen intervened in this action on April 14 it was unknown whether such action was consistent with its designated function. While the extent of the legal capacity of an institution is technically determined by resort to its "statut" in this case, as Elicofon himself asserts, the immediate reason for conferring juristic status upon the Kunstsammlungen was so that it could intervene in this action, as envisioned in the order of April 14, 1969. Under these circumstances, it would be unreasonable to find that its intervention was unauthorized. Even if the Kunstsammlungen's intervention in this action before adoption of its "statut" was improper, at most, the error was merely a technical one, which we are certain the courts of the German Democratic Republic would overlook. In any event, once the "statut" was adopted the lack of capacity was cured. Lack of capacity can be remedied after the commencement of proceedings.[26]

■ We also reject Elicofon's second argument that the Kunstsammlungen, as a mere carrier or administrator ("Rechstraeger") of public rights in the Duerers, does not have standing to bring this action. He claims that the constitution and legislation of the German Democratic Republic provide that carriers of public rights, such as the Kunstsammlungen, merely hold rights that properly belong only to the state and the people, and that property rights in state property may be enforced only by the state, and not by juristic persons whose authority is limited to administration. Provision of the Civil Code of the German Democratic Republic adopted in 1976 and various commentories strongly suggest that a holder of rights in people's-owned property can assert a claim to secure its and the state's rights

therein. For instance, pursuant to § 20 of the Civil Code, holders of rights in people's property are obligated to protect such property. In 2 Goring, Grundriss Zivilrecht, ("Outline of the Civil Law") 16, it is stated:

> Insofar as people's-owned property is concerned, ... it must be emphasized that the orderly use of such property necessitates a grant of relative autonomy, with a view to permanence of the proprietor's authority. The socialist state, as proprietor, transfers the authority it possesses to people's-owned enterprises, *Kombinate*, economic administrative organs, state organs and institutions, which possess people's-owned property entrusted to them on the basis of the provisions of law, use and, in implementation of the state plans, dispose of such property.

Authority is to the same effect concerning the state of the law before the adoption of the Civil Code. Thus, in M. Posch, Das Zivilrecht der DDR—Allgemeiner Teil ("Civil Law of the GDR—General Part") 208 (1955), it is stated: "The powers flowing from State property rights are exercised by the legally authorized state organs in their own names in fulfillment of state plans.... In contrast are the extremely rare cases in which the state itself appears as the subject of civil law in legal transactions." Finally, it is stated in G. Klinger, Das Zivilrecht der DDR—Sachenrecht ("Civil Law of the GDR—Things") 230 (1956) that "the claim for recovery of a thing belongs to the State organ which exercises the operative administration for the State." The Kunstsammlungen, as the "carrier of rights" in the paintings has the right to assert the claim for their return.

We find that the Kunstsammlungen has capacity and standing to bring this action to recover possession of the Duerers.

## CONCLUSION

The Kunstsammlungen as a matter of law has demonstrated that the Duerers

---

26. We also reject Elicofon's argument that the failure to publish the order of April 14 or the "statut" in the official gazette deprived the Kunstsammlungen of capacity. Elicofon offers no support that such publication is required or, moreover, even if required, that the failure to do so should defeat an action. Reason and fairness dictate the contrary.

were stolen and that it is entitled as owner to possession. Defendant has not offered evidence to the contrary to support any fact issue. The issues presented are issues of law. Elicofon has had a full and fair opportunity to discover evidence showing a real issue to be tried and has failed to do so. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1980). Summary judgment should not be denied "on the basis of a mere hope [of the opposing party] that evidence to support his claim will develop at the trial." *Taylor v. Rederi A/S Volo,* 374 F.2d 545, 549 (3d Cir. 1967). Neither should the existence of a complex fact situation bar summary judgment if the material facts are undisputed as they are in this case. 10 Wright & Miller, Federal Practice and Procedure § 2732, p. 606. Similarly, if the decision rests on an issue of law, the fact that it poses a difficult problem of interpretation or application should not stand in the way of a Rule 56 motion if there is no triable issue of fact. 10 Wright & Miller, *supra.* For these reasons summary judgment has been upheld in both antitrust cases, *First Nat. Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Modern Home Institute, Inc. v. Hartford Acc. & Indem. Co.,* 513 F.2d 102 (2d Cir. 1975); *Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230 (6th Cir.), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974); *Beckman v. Walter Kidde & Co.,* 451 F.2d 593 (2d Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972), and in patent cases, *Grayson v. McGowan,* 543 F.2d 79 (9th Cir. 1976); *Proler Steel Corp. v. Luria Bros. & Co.,* 417 F.2d 272 (9th Cir. 1969); *Vermont Structural Slate Co. v. Tatko Bros. Slate Co.,* 233 F.2d 9 (2d Cir.), *cert. denied,* 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123 (1956), which involved complex facts and difficult issues of law. To deny summary judgment in the case before us would defeat the purpose of Rule 56 since there exists no material fact issue for trial.

*Judgment*

Because the Duerers are unique chattels, the court may exercise its equitable jurisdiction to enter a judgment directing Elicofon to deliver the paintings to the Kunstsammlungen. N.Y.C.P.L.R. § 7109; *Chabert v. Robert & Co.,* 273 A.D. 237, 76 N.Y.S.2d 400 (1st Dep't. 1948); *Raftery v. World Film Corp.,* 180 A.D. 475, 167 N.Y.S. 1027 (1st Dep't. 1917). The contempt remedy is provided in N.Y.C.P.L.R. § 7109(b) to compel delivery after judgment. Thus, an alternative provision for recovery of the value of the chattel need not be included in the judgment where the chattel is unique. *St. Germain v. Advance Fireproof Storage Warehouse Corp.,* 44 Misc.2d 719, 254 N.Y.S.2d 971 (Sup.Ct.Nassau Co. 1964). *See generally* 7A Weinstein-Korn-Miller, New York Civil Practice § 7108.02, p. 71–73; *Id.* § 7109, p. 71–84 to 71–87.

Plaintiff's motion for summary judgment is granted and defendant's cross motion for summary judgment denied. Defendant is directed to deliver the Duerers to plaintiff, the Kunstsammlungen.

SO ORDERED.

Settle judgment on five (5) days notice by personal service, eight (8) days by ordinary mail. The judgment is to include the direction to the Clerk of the Court to enter judgment against the Grand Duchess of Saxony-Weimar. Service of notice of settlement on attorneys for Elicofon and the Grand Duchess of Saxony-Weimar is directed.